**Albert J. McDONALD, Appellant,**

v.

**Robert W. O'MEARA et al., Appellees.**

**No. 17090.**

United States Court of Appeals
Fifth Circuit.

Aug. 27, 1958.

Rehearing Denied Oct. 8, 1958.

Robert Weinstein, New Orleans, La., Sylvan J. Steinberg (of Rittenberg, Weinstein & Bronfin), New Orleans, La., Robert B. Butler, Jr., Houma, La., for appellant.

Clem H. Sehrt, Harry McCall, Jr., M. Truman Woodward, Jr., G. Henry Pierson, Jr., H. H. Hillyer, Jr., New Orleans, La., for Louisiana Land & Exploration Co.

Clement M. Moss, of Moss & Graham, Lake Charles, La., Richard M. Mathews, Edward J. Boyle, New Orlans, La., for Robert W. O'Meara.

Before RIVES, JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Albert McDonald sued Robert O'Meara and others [1] to cancel a mineral lease (sublease) on the ground that O'Meara, the lessee, violated the lease in failing to pay the lessor his royalty (rents) in accordance with their agreement. The narrow question to be decided is whether O'Meara's delivery of oil to the Texas Company, by pipe line, to be credited to McDonald's account,[2] was payment to McDonald in accordance with the agreement between the parties. The district court

1. McDonald brought suit in the District Court for the Parish of Terrebonne, Louisiana. Suit was removed to the United States District Court for the Eastern District of Louisiana. McDonald joined as defendants the First City National Bank of Houston and T. W. Archer, who hold mortgages secured by O'Meara's interest in the lease. Louisiana Land and Exploration, that holds a one-thirty-second overriding royalty from O'Meara, also was named as defendant.

2. The Texas Company held the oil in a suspense account. The Texas Company prepared division orders which were distributed to O'Meara and the other owners of the oil. McDonald refused to execute his division order to obtain his share of the oil produced and sold to The Texas Company.

found no genuine issue as to any material fact. The court granted defendants' motions for a summary judgment and dismissed the suit as to all defendants. We affirm this judgment.

## I.

May 7, 1955, Philip J. Daspit granted a mineral lease to McDonald covering certain property on Timbalier Island in Terrebonne Parish, Louisiana. A month later McDonald subleased to O'Meara, but reserved an overriding royalty of one-eighth of the oil, gas, and other minerals produced. O'Meara completed his first well December 7, 1955 and later brought in three more wells.

Sometime before Daspit leased to McDonald, Felix Broussard leased the same property to Tidewater Associated Oil Company. To settle the ownership, Daspit sued Broussard. During this litigation O'Meara continued to drill and to operate the property, but because of uncertainty as to the outcome of the suit, he withheld payment of the royalty until May 31, 1956. On that date he entered into an escrow agreement with McDonald. The agreement required O'Meara to make payments to the Citizens National Bank & Trust Company of Houma, Louisiana, in escrow, pending final determination of the Daspit v. Broussard suit. May 22, 1957 final judgment was rendered recognizing Daspit's ownership.

From the completion of the first well, December 7, 1955, until January 23, 1957, because there was no pipe line connection at Timbalier Island, O'Meara barged the oil, selling at the point of barge delivery. O'Meara deposited with the escrow agent the amount due McDonald as his royalty for the period from December 7, 1955 to January 23, 1957. In the meantime, Texas Company constructed a pipe line to Timbalier Island, attaching it to O'Meara's wells January 23, 1957. After that date O'Meara made no further deposits to the escrow agent, since all of the oil produced was delivered to the Texas Company. The Texas Company prepared a division order recognizing McDonald's royalty interest. McDonald has refused to execute this division order and has allowed his share of the oil proceeds to remain with the Texas Company.

McDonald contends that O'Meara's failure to continue making deposits in escrow violated the sublease and is good ground for cancellation of the sublease. McDonald filed suit to cancel before the termination of the Daspit v. Broussard litigation.

## II.

The original mineral lease from Daspit to McDonald contains the following provision for payment of royalty to the lessor: "Oil royalties shall be delivered to Lessor free of expense at Lessor's option *in tanks furnished by Lessor at the well or to Lessor's credit in any pipe line connected therewith.* In the event Lessor does not furnish tanks for such royalty oil and no pipe line is connected with the well, Lessee may sell Lessor's royalty oil at the best market price obtainable and pay Lessor the price received f.o.b. the leased property, less any severance or production tax imposed thereon."

The sublease to O'Meara stipulated that McDonald's overriding royalty should be paid in the same manner as provided for in the original lease: "Assignor reserves to himself a one-eighth (⅛) of eight-eighths (⅞) overriding royalty out of all the oil, gas and other minerals produced, saved and marketed from the hereinabove described property; said overriding royalty shall be free of all cost to Assignor, and subject only to Assignor's proportionate share of the severance taxes which shall be due and payable thereon. *Said overriding royalty shall be paid and/or delivered in the same manner as provided in said lease for royalties of the Lessors therein.*"

Under the terms of the lease and sublease, therefore, O'Meara's delivery of the oil to the pipe line, constituted delivery of the overriding royalty to McDonald. There is no doubt that delivery to a pipe line purchaser is the usual

and preferred method of marketing oil. It is undisputed that all of the oil produced after January 23, 1957 was delivered to the Texas Company.

McDonald claims that the escrow agreement had the effect of amending the sublease, and that O'Meara's failure to continue payments to the escrow agent after January 23, 1957 therefore was a violation of the sublease.

It is unnecessary to determine whether the escrow agreement operated as an amendment to the sublease or as a separate contract. We read the escrow agreement as continuing during the Daspit v. Broussard litigation but as limited in its effect to the period when O'Meara was barging oil, selling it, and handling the entire proceeds. The parties never intended the escrow to apply to the period when the oil would be delivered to a pipe line purchaser and O'Meara would have no funds in his hands belonging to McDonald to be deposited with the escrow agent.

The purpose and scope of the escrow agreement are clear enough. During the time O'Meara was barging the oil and selling it, he was accumulating a considerable sum of money. McDonald objected to O'Meara's possession of the money during the litigation over title. For O'Meara the purpose of the escrow was to put the royalty in the hands of a stakeholder until title could be determined. For McDonald the purpose was to protect his royalty while O'Meara was handling large sums derived from sales of the oil.

The agreement obligates O'Meara to deposit with the Houma bank the proceeds from one-eighth of the oil, "less severance taxes and cost of collection, which O'Meara has previously sold". Then, "O'Meara shall continue to purchase and run the oil claimed by McDonald", depositing McDonald's portion "less severance taxes and costs of transportation". McDonald "takes cognizance of the necessity of barging said oil by the present purchaser". It seems to us, therefore, that the escrow dealt with a temporary situation and had meaning only as long as O'Meara was barging and selling the oil at the point of barge delivery, and had McDonald's funds in his hands. The lease and sublease clearly contemplate marketing of oil through a pipe line purchaser as standard operating procedure; failure to take advantage of the Texas Company pipe line to Timbalier would have exposed O'Meara to possible liability for not protecting the lessor's interests.

When final judgment was rendered in Daspit v. Broussard, May 22, 1957, the escrow by its terms ended. McDonald withdrew all of the proceeds representing his overriding royalty from the beginning of production to January 23, 1957. Proceeds due him after January 23, 1957 are being held for his account by the Texas Company, in accordance with the express terms of the sublease and lease. O'Meara's delivery by pipe line to the Texas Company of all the oil produced under the lease, with a proper credit to McDonald's account of his royalty interest, constituted payment to McDonald. O'Meara has done all that he was obligated to do under his agreements with his lessor.

### III.

■ November 23, 1956, O'Meara purchased the mineral lease that Tidewater had acquired from Broussard. McDonald alleges that (1) the acquisition was concealed from him; (2) that, in effect, the acquisition perfected title to McDonald's lease from Daspit, since a lessee cannot dispute his lessor's title; (3) that O'Meara was placed in the position of having to pay McDonald immediately for the overriding royalty reserved on the Daspit lease.

There is no merit to these contentions. (1) The Tidewater lease was recorded on the public records of Terrebonne six months before McDonald filed suit. (2) Under the terms of the O'Meara sublease from McDonald the "Lessee shall have the right to purchase a lease or leases from others to protect its leasehold rights and shall not thereby be held to have disputed Lessor's title; and, in the event Lessor's title or interest

therein is claimed by others, Lessee shall have the right to withhold payment of royalties or deposit such royalties in the registry of the Court until final determination of Lessor's rights." (3) At the time of O'Meara's purchase of the Tidewater lease the Daspit-Broussard action was still pending. O'Meara had put himself in the position of protecting his leasehold, but there was uncertainty as to which lease was valid. He was justified therefore in continuing to make deposits as provided in the escrow agreement.

We have considered the contentions of the Appellant's resourceful counsel in addition to those referred to in this opinion. There may be more to this case than meets the eye, as implied in the briefs and oral argument. But we are limited to what we find out in the open. The judgment is

Affirmed.